STATE OF MINNESOTA

IN SUPREME COURT

A23-0064

Court of Appeals

McKeig, J.
Took no part, Gaïtas, J.

Minnesota Internship Center,

Appellant,

vs.

Filed: August 7, 2024
Office of Appellate Courts

Minnesota Department of Education,

Respondent.

_____

Jack Y. Perry, Brayanna J. Smith, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota; and

John Cairns, John Cairns Law, P.A., Minneapolis, Minnesota, for appellant.

Keith Ellison, Attorney General, Peter J. Farrell, Deputy Solicitor General, Alec Sloan, Assistant Attorney General, Saint Paul, Minnesota, for respondent.

_____

S Y L L A B U S

When fraudulent activity is alleged against a school district or charter school, the Commissioner of the Minnesota Department of Education has the statutory authority to audit the aid appropriations distributed to school districts or charter schools under Minnesota Statutes section 127A.41 (2022) and is not required to investigate under Minnesota Statutes section 127A.42 (2022).

Affirmed.

1

MCKEIG, Justice.

This appeal requires us to determine whether, when the Minnesota Commissioner of Education (the Commissioner) receives a complaint that a school has intentionally misreported its enrollment numbers, the Commissioner must investigate the school under a statute which deals with violations of law, rather than a statute that allows for audits to correct for funding disparities. Respondent the Minnesota Department of Education (the Department) supervises the distribution of state aid to schools and accordingly has the power to select schools for audits, audit those schools, and adjust state aid if an audit shows an over- or underpayment. Appellant the Minnesota Internship Center (the School) is a charter school and was the subject of a citizen complaint alleging that it manipulated attendance records—a practice which could have resulted in overpayments in aid to the School. Based on the complaint and a subsequent assessment, the Department audited the School. As a result of the audit, the Department retroactively decreased the aid to the School by over $1.3 million.

The School appealed administratively to the Department and the decision was affirmed. The School then appealed to the court of appeals, arguing that the Department conducted the audit under the wrong statute—Minnesota Statutes section 127A.41 (2022)—which deals with adjustments to aid distributions. The School claimed that it should have been investigated under the statute that deals with a continuing violation of law—Minnesota Statutes section 127A.42 (2022). The court of appeals affirmed. Because

the Commissioner had the legal authority to conduct an audit under section 127A.41, we affirm.

## FACTS

The Department has been tasked by the Legislature with distributing state aid to school districts or charter schools. *See* Minn. Stat. §§ 127A.40 (2022), 127A.41, subd. 1. This distribution includes "general education revenue" and "compensatory education revenue." *See* Minn. Stat. § 126C.10, subds. 1 and 3 (2022) (defining "general education revenue" and "compensatory education revenue," respectively). An integral component of the calculation of general education revenue is the number of "adjusted pupil units" for the school year. *See generally* Minn. Stat. § 126C.10 (2022). These adjusted pupil units depend on the "average daily membership" of the district or charter school, which is the mean of the number of students enrolled in a district or charter school each school day during the school year. *See* Minn. Stat. § 126C.05, subds. 1, 5, 8(a) (2022). A student is enrolled in a district or charter school until the date of their withdrawal, and a student who is absent for 15 consecutive days is considered withdrawn. *Id.* at subd. 8(a). By contrast, compensatory education revenue is calculated, in part, by accounting for the number of enrolled students who are eligible for free or reduced-price lunch. *See* Minn. Stat. §§ 126C.05, subd. 3 (2022), 126C.10, subd. 3.

In addition to distributing funds, the Department must also audit the pupil counts of at least 25 school districts or charter schools per year to ensure financial accountability. Minn. Stat. § 127A.41, subd. 3. The Department is authorized by the Legislature to create the procedures both for conducting the audits and for selecting which districts or charter

3

schools are to be audited. *Id.* Accordingly, the Department created the Minnesota Department of Education Procedures for Conducting District Audits and Audit Appeals.[1] This document states that the Department's audit selection procedure considers, among other factors, randomicity, requests from Department employees, follow-up audits based on previous findings, and "audits selected through requests submitted by districts, citizens, etc." Further, the audit selection criterion for citizen requests states that "[a]ll requests are given a preliminary assessment in which [the Department] gathers background information and evaluates the information/evidence provided by the complainant."

The School reported an average daily membership of 520.98 for fiscal year 2018.[2] Based on that number, the School reported the number of students eligible for free or reduced price lunch as 485 for fiscal year 2019.[3] In September 2018, the Department received two citizen complaints, one against the School and one against its authorizer.[4] The complaints alleged that the School had "engaged in activities that potentially violate

---

[1]  *See* Minn. Dep't. of Educ. Procs. for Conducting Dist. Audits and Audit Appeals (Revised Aug. 14, 2017).

[2]  Fiscal year 2018 covers the 2017-2018 school year. Likewise, fiscal year 2019 covers the 2018-2019 school year.

[3]  This number is based on the number of students enrolled on October 1 of the *previous* school year. *See* Minn. Stat. § 126C.05, subd. 3 (2022).

[4]  An "authorizer" is one of a statutorily enumerated list of organizations that may "authorize one or more charter schools." Minn. Stat. § 124E.05, subd. 1 (2022). Among other things, an "authorizer" must oversee "the fiscal and student performance of the charter school." Minn. Stat. § 124E.06, subd. 4 (2022).

both state and federal law." The complaint against the School alleged, among 10 other claims, that

> The school engaged in fraudulent attendance practices, wherein they did not drop many students after 15 consecutive days of absence. This was done solely for financial benefit. The authorizer has known that the school has "warehoused" students before, but the practice was never this egregious. . . . Employees are directed to NOT drop students after 15 days absence.

The Department notified the School's authorizer, and the authorizer requested that the School respond to the allegations. The School acknowledged that its previous administration had fabricated student attendance records in prior years but claimed to have made all necessary corrections for the 2018-2019 school year.

Based on the citizen complaints, the Department selected the School as one of its 25 mandated audits for the year. The audit began in March 2019 with an entrance interview with administrators from the School. At this meeting, the School explained to the audit team that there were two types of attendance records—electronic attendance records and manual sign-in sheets—and that all students were required to sign in on the manual sheets. The School provided the audit team with both types of attendance records. Through examination of these records, the audit team discovered several discrepancies between the manual and the electronic attendance records, and "the auditors determined that the electronic attendance records were not a sufficient, complete, or reliable form of documentation." Consequently, the auditors used the manual attendance records—the source documents from which the electronic attendance records were taken—to verify and cross-check the School's previously reported attendance.

5

In October of 2021, the audit was complete, and its results were shared with the School. The audit found nine types of reporting inaccuracies related to general education revenue resulting in a net decrease in average daily membership of 137.28, with a recommended downward adjustment in general education revenue of $868,793.11. The audit also found six types of reporting inaccuracies related to compensatory revenue resulting in a net decrease in enrolled students eligible for free lunch of 131, with a recommended downward adjustment in compensatory revenue of $487,753.76. The total recommended adjustment resulted in an overall decrease of $1,356,546.87, which the Commissioner accepted.

The School appealed the results of the audit administratively and offered its own, much lower estimate for the decrease in aid, but the results of the audit were upheld.[5] The School then appealed to the court of appeals. The School argued, in part, that because the allegations involved a potential violation of law, the Department could audit the School *only* under a statute that related to violations of law.[6] *Minn. Internship Ctr. v. Minn. Dep't*

---

[5] The audit team acknowledged it had made one error due to a student who used a different name for manual sign-in than the name reported in the year-end data. The appeals committee corrected that error by accepting the School's appeal as it related to that one student.

[6] The School also claimed at the court of appeals that 1) section 127A.41—the statute authorizing pupil count and aid audits—does not apply to charter schools; and 2) the Commissioner's decision was arbitrary and not supported by substantial evidence. *Minn. Internship Ctr. v. Minn. Dep't of Educ.*, 996 N.W.2d 34, 40 (Minn. App. 2023). The court of appeals rejected these arguments and the School did not seek further review of these issues. *Id.* at 55. Therefore, these issues are not before this court.

*of Educ.*, 996 N.W.2d 34, 40 (Minn. App. 2023). The court of appeals affirmed the Commissioner's decision in all respects. *Id.* at 55.

The School petitioned this court for further review of one issue—whether the Department was *required* to proceed under the statute related to violations of law, Minn. Stat. § 127A.42, instead of the statute that requires the Department to perform 25 pupil count and aid entitlement audits per year, Minn. Stat. § 127A.41. We granted review.

## ANALYSIS

The Department is an administrative body, and the Commissioner's decision here is a quasi-judicial agency decision. "[J]udicial review of the quasi-judicial decisions of administrative bodies is limited to review by certiorari, in which the court's inspection of the record is necessarily confined to questions affecting the jurisdiction of the board, the regularity of its proceedings, and, as to merits of the controversy, whether the order or determination in a particular case was . . . under an erroneous theory of law . . . ." *Jackson v. Comm'r of Hum. Servs.*, 933 N.W.2d 408, 413 (Minn. 2019) (citing *Dietz v. Dodge Cnty.*, 487 N.W.2d 237, 239 (Minn. 1992) (internal quotation marks omitted). Here, the School challenges whether the Department had the statutory authority to investigate the School's attendance reporting under the pupil count and aid entitlement audit procedure, or whether the Department was instead required to investigate the alleged reporting errors as a violation of law. This issue turns on whether an agency exceeded its statutory authority and is a matter of statutory interpretation. Such a "question is one of law that we review de novo." *Save Lake Calhoun v. Strommen*, 943 N.W.2d 171, 176 (Minn. 2020).

7

Minnesota Statutes section 127A.41 concerns the distribution of school aid and is the statute under which the Department audited the School. Under section 127A.41, subdivision 1, the Commissioner is tasked with the supervision of "distribution of school aids and grants in accordance with law." The next subdivision concerns errors in distribution and provides that, "[o]n determining that the *amount of state aid distributed to a school district is in error*, the commissioner is authorized to adjust the amount of aid" given to the school and may "recover the amount of the excess by any appropriate means," including "reducing future aid payments to the district." *Id.* at subd. 2 (emphasis added).

> The statute also describes an audit process, stating:
>
> The commissioner shall establish procedures for conducting and shall conduct audits of district records and files *for the purpose of verifying district pupil counts,* levy limitations, *and aid entitlements.* The commissioner shall establish procedures for selecting and shall select districts to be audited. Disparities, if any, between pupil counts, levy limitations, or aid entitlements determined by audit of district records and files and data reported by districts in reports, claims and other documents shall be reviewed by the commissioner *who shall order increases or decreases accordingly.* Whenever possible, the commissioner shall audit *at least 25 districts each year* pursuant to this subdivision. Procedures adopted under this subdivision . . . may differ from the procedures under section 127A.42.

*Id.* at subd. 3 (emphasis added). Stated more plainly, under section 127A.41's audit process, the Commissioner must 1) select and audit at least 25 districts or charter schools each year to verify accurate pupil counts; 2) order increases or decreases to aid entitlement in cases of inaccurate pupil counts; and 3) recover any excess funds allocated to a school by any appropriate means.

Minnesota Statutes section 127A.42, on the other hand, concerns reductions in aid for violations of law. Subdivision 2 specifically covers violations of law and provides:

8

The commissioner *may* reduce or withhold the district's state aid for any school year whenever the board of the *district authorizes or permits violations of law* within the district by:

(1)   employing a teacher who does not hold a valid teaching license or permit in a public school;

(2)   noncompliance with a mandatory rule of general application promulgated by the commissioner in accordance with statute, unless special circumstances make enforcement inequitable, impose an extraordinary hardship on the district, or the rule is contrary to the district's best interests;

(3)   the district's continued performance of a contract made for the rental of rooms or buildings for school purposes or for the rental of any facility owned or operated by or under the direction of any private organization, if the contract has been disapproved, the time for review of the determination of disapproval has expired, and no proceeding for review is pending;

(4)   any practice which is a violation of sections 1 and 2 of article 13 of the Constitution of the state of Minnesota;

(5)   failure to reasonably provide for a resident pupil's school attendance under Minnesota Statutes;

(6)   noncompliance with state laws prohibiting discrimination because of race, color, creed, religion, national origin, sex, age, marital status, status with regard to public assistance or disability, as defined in sections 363A.08 to 363A.19 and 363A.28, subdivision 10; or

(7)   using funds contrary to the statutory purpose of the funds.

*Id.* at subd. 2 (emphasis added). This section requires that the Commissioner notify the board of the district of a violation and allows the board to dispute the alleged violation and/or correct the violation to avoid any aid reduction or withholding. *Id.* at subds. 4–6.

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2022). "[W]ords and phrases are construed according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1) (2022). "If the Legislature's intent is clear from the statute's plain and unambiguous language, then we interpret the statute according to its

9

plain meaning." *State v. Cummings*, 2 N.W.3d 528, 533 (Minn. 2024) (quotation marks omitted) (citation omitted).

The School claims that because the alleged fraudulent attendance activity of the former administration is arguably a crime, this "triggered" an investigation under section 127A.42 and precludes an investigation by audit under section 127A.41. Beginning our analysis with section 127A.42, that section provides that the Commissioner may reduce or withhold the district's state aid for certain violations of law. Despite the claim that the alleged violation of law "triggered" an investigation under section 127A.42, the School does not direct us to any "triggering" language in this section, nor do we find any. Further, there is no language in section 127A.42 that forecloses an investigatory audit under section 127A.41. Thus, irrespective of whether the Department *could* have pursued an investigation under section 127A.42, there is nothing in that section mandating or automatically triggering that the Department do so.

The sole remaining question is then whether there is anything in the language of section 127A.41 precluding the Department from using the audit procedure as a means of investigation. Here too, the School does not direct us to any "triggering" language, instead seeming to suggest that the Department's audit under section 127A.41 was improper because it did not conform to the procedures laid out in section 127A.42. But the language regarding audits in section 127A.41 suggests the contrary. Explicitly, section 127A.41, subdivision 3, provides that the "[p]rocedures adopted under this subdivision . . . may *differ* from the procedures under section 127A.42." (Emphasis added.)

The School, for its part, also argues that section 127A.41, in subdivision 2, allows only for aid adjustments due to "errors," and that "errors" include only unintentional acts. *See* Minn. Stat. § 127A.41, subd. 2. The School relies on the *Merriam-Webster* online dictionary's definition of "error" to mean "an act involving an unintentional deviation from truth or accuracy," or "a mistake . . . ." Error*, https://www.merriam-webster.com (last visited July 31, 2024).[7] Because fraudulent attendance reporting undertaken for financial gain is an intentional act, the School claims such an act could not be considered an "error."

This argument is unpersuasive. The School's chosen definition—read according to the rules of grammar—does not support its argument. The relevant statutory language relied upon by the School as allowing the Commissioner to adjust state aid reads: "On determining that the amount of state aid distributed to a school district is in *error* . . . ." Minn. Stat. § 127A.41, subd. 2 (emphasis added). The root verb here—distribute—is the action that would have resulted in any "error." The entity distributing state aid to a district or charter school is not the School itself, but rather the Department. Nothing in the record suggests that the Department was aware of the School's fraudulent attendance practices before the citizen complaint, so any deviation from accurate distribution would have been *unintentionally* done by the Department. The mere fact that the School's misreporting

---

[7] The School's offered definition is consistent with commonly used print dictionaries. *See, e.g.*, *Error, The American Heritage Dictionary of the English Language* 605 (5th ed. 2018) (defining "error" as "[a]n act, assertion, or belief that unintentionally deviates from what is correct, right, or true," or "[a] mistake").

11

caused the Department to make the error does not transform it from an unintentional into an intentional deviation from truth or accuracy.[8]

The School also cites to two different cases as persuasive authority to support its argument. The first, *In the Matter of the Petition for Review of the Minn. Dep't of Education's Procedure Regarding Audit Report Appeals*, OAH 5-1300-33879, 2016 WL 7462532 (Minn. OAH Dec. 7, 2016), involved a charter school that was investigated under section 127A.41 after allegations that the school had violated federal regulations. But rather than addressing whether the Department had the authority to audit the school under section 127A.41 as is the issue here, that case involved whether the Department's appeal procedure adhered to the requirements of the Minnesota Administrative Procedure Act. *Id.* at \*7. Not only is that decision irrelevant to the issue before us today, but the Legislature changed the language at issue in that case during the very next legislative session, making the ruling entirely immaterial to the statutory scheme at issue in this case. *See* Act of May 30, 2017, ch. 5, art. 1, § 15, 2017 Minn. Laws 1st Spec. Sess. 1, 10.

The second case, *United States v. Minnesota Transitions Charter School*, 50 F. Supp. 3d 1106, 1108 (D. Minn. 2014), involved allegations of fraudulent attendance

---

[8] The School also seems to suggest that fraudulent attendance practices cannot be considered a "[d]isparit[y]" for purposes of the audit process described in section 127A.41, subdivision 3, though it offers no arguments or analysis to support this assertion. "Disparity" is defined as "[t]he condition or fact of being unequal . . . " or "[u]nlikeness; incongruity." *Disparity*, *The American Heritage Dictionary of the English Language* 520 (5th ed. 2018). Because the reported attendance numbers were unequal, unalike, and incongruous with the attendance numbers as determined by the audit team, there existed a clear "[d]isparit[y] . . . between pupil counts," allowing the Commissioner to "order . . . decreases accordingly." Minn. Stat. § 127A.41, subd. 3.

practices against a charter school, similar to the case before us. But that is where the similarities end. Not only was the Department not a party to the action in *Transitions*, neither of the statutes at issue here were involved in that case. *See id.* Ultimately, the cited case law is unpersuasive, and the School has failed to show that the Department lacked the statutory authority to perform its audit under section 127A.41. Further, nothing in the plain language of either sections 127A.41 *or* 127A.42 suggests that the Department must investigate only under section 127A.42 if there are allegations of illegal behavior.

For its part, the Department argues that "the [C]ommissioner has complied with the legislative mandate in section 127A.41 and established procedures for selecting districts and charter schools for audits," and we agree. By its plain language, the only reasonable reading of section 127A.41 allows the Commissioner to have established the procedures by which the School was selected for an audit, and furthermore allows for the subsequent audit of the School and the consequent reduction in aid.

Accordingly, we conclude that the Department had the authority to audit the School under section 127A.41 and was not required to investigate under section 127A.42, despite the allegations of fraudulent activity.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

GAÏTAS, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.